[No. A124374. First Dist., Div. Five. Jan. 5, 2010.]

DONALD L. JUNKIN III, Plaintiff and Appellant, v.
GOLDEN WEST FORECLOSURE SERVICE, INC., et al., Defendants and
Respondents.

1152

COUNSEL

David M. McKim for Plaintiff and Appellant.

Cheryl C. Rouse and Jonathan G. Chance for Defendants and Respondents.

OPINION

**JONES, P. J.**—In this appeal we consider whether the joint venture exception to the usury laws was properly applied by the trial court.

Appellant Donald L. Junkin III filed a complaint against respondents Golden West Foreclosure Service, Inc., and Gary Bennett, a fellow investor and acknowledged business partner, to enjoin the threatened foreclosure of an office building in San Carlos under an allegedly usurious promissory note and deed of trust held by Bennett. Ultimately, the foreclosure sale was completed. Junkin then amended his complaint to seek damages for wrongful foreclosure and usurious interest. The trial court ruled in favor of respondents, finding Junkin and Bennett were partners in a joint venture transaction, which excepted the transaction from the usury laws. On appeal, Junkin challenges this ruling. We reject his contentions and affirm.

### I. FACTUAL AND PROCEDURAL BACKGROUND

Junkin has been a licensed real estate agent since 1993. He has extensive experience in the real estate business and has owned and operated several real estate agencies and mortgage brokerage companies.

Junkin met respondent Bennett in 1994. Bennett was a "hard money" lender who specialized in providing money quickly at high rates. Over the years, Junkin borrowed money from Bennett between 40 and 60 times. As Junkin explained, sometimes he would be presented with a "very good deal . . . but speed, time is of the essence, and the more conservative rates took more time." In those instances, "[Bennett] was the phone call." Junkin and Bennett also invested in property jointly on as many as a dozen occasions.

In approximately 2004, Junkin learned certain commercial property located on El Camino Real in San Carlos was available. The property was vacant and in a distressed condition. However, the property was in a good location and Junkin believed it was a good value. Junkin approached others about possibly investing in the property, but they could not come up with enough money quickly enough. Therefore, Junkin asked Bennett to provide the necessary financing. Bennett agreed.

Junkin and Bennett purchased the property for $1.975 million; $1.185 million of that amount came from an institutional lender. Junkin and Bennett were both jointly obligated on that loan. The remainder of the purchase price was provided by Bennett, who contributed $856,000. In exchange for Bennett's contribution, Junkin prepared and signed a $960,000 promissory note secured by a deed of trust in favor of Bennett. The note carried an interest rate of 12 percent and required monthly payments of $9,600. The difference between the note amount and the amount Bennett contributed to the purchase price represented "points" on the loan.

Junkin and Bennett were both placed on the title to the property and both considered themselves to be partners in the venture. Under the terms of their agreement, Junkin owned a 90 percent interest and Bennett owned 10 percent. Junkin agreed to make all payments on the first note and Bennett's second note, and to pay all property taxes and insurance.

Junkin did not make the payments required under the first or second note and did not pay the insurance premiums on the property. Afraid that his second deed of trust would be wiped out if the owner of the first note foreclosed, Bennett made payments on the first note himself and paid the property taxes.

Bennett became "tired [of] paying for the building." He concluded the building was no longer a viable investment "the way it was being run and operated," and decided to disassociate himself from the building and Mr. Junkin. He quitclaimed his 10 percent interest in the property back to Junkin. Junkin then refinanced the property with another lender.

Junkin had not made any payments on his note to Bennett since December 2006. Therefore, Bennett decided to foreclose. He retained respondent Golden West Foreclosure Service, Inc. (Golden West), and authorized a nonjudicial foreclosure sale. Bennett instructed Golden West to open the bidding at $700,000.

Junkin responded by filing a complaint against Bennett and Golden West. He alleged his $960,000 note in favor of Bennett was usurious and sought a

temporary restraining order to prevent the foreclosure. The trial court granted Junkin a temporary restraining order, but denied his subsequent request for a permanent injunction.

The foreclosure went forward and Bennett purchased the property at the trustee sale for $700,000.

Junkin then amended his complaint to seek damages for, inter alia, wrongful foreclosure.

The case proceeded to a court trial where Junkin took the position that the $960,000 loan from Bennett was usurious and that the foreclosure was unlawful. Bennett countered that even if the interest rate on the loan could be characterized as usurious, there was no usury under the joint venture exception to the usury laws. The trial court agreed with Bennett, explaining its decision as follows:

"The court has looked at the length and history of the relationship between Mr. Junkin and Mr. Bennett, the nature of the relationship, and the nature of this transaction. When the court looks at the entirety of the evidence, particularly the nature of this transaction—it is clear that this transaction falls into the category of a joint venture.

"As the defendant, Bennett, points out, the evidence demonstrated that Mr. Junkin considers himself to be a real estate expert—whether he actually used the term 'real estate broker' or not. He has invested in real estate for many years. He and Mr. Bennett are very sophisticated in that area.

"According to the evidence, Mr. Junkin approached Mr. Bennett to purchase the subject property located at 626–628 El Camino Real in San Carlos, California.

"Mr. Junkin pursued the purchase. He testified that he was partners with Mr. Bennett in this purchase. He found financing of the first loan. Both Mr. Junkin and Mr. Bennett were jointly obligated on the first loan. Plaintiff requested that Mr. Bennett provide additional funding to reflect the balance of the purchase price of the building. Both Mr. Junkin and Mr. Bennett were on the title to the property. Upon purchase of the property—Mr. Junkin would own ninety percent (90%) of the building and Mr. Bennett would own ten percent (10%).

"It is clear from the evidence that both parties considered themselves to be partners in this transaction. The evidence also shows that both parties' expectations were that they would share any profits according to their percentage of ownership.

"Mr. Junkin negotiated the purchase and provided the terms of the note including the interest rate and loan terms. He also worked through his long time escrow agent, Ms. Holley. Mr. Bennett did not see the note or deed of trust prior to Mr. Junkin signing it. The total loan was $960,000.

"The court agrees with the defendant Bennett's argument that the note was only incidental to the fact that this transaction was a joint venture hopefully to provide profits to both according to their respective percentage ownership.

"The fact that the plaintiff was an experienced real estate investor, came up with all the terms of the transaction based upon his prior experience with Mr. Bennett lends itself to the conclusion that this was a joint venture and thus exempt from the law of usury."

Having concluded the joint venture exception applied, the court also ruled the foreclosure was not invalid. Accordingly, the court entered judgment in favor of Bennett and Golden West.

## II. *DISCUSSION*

Usury is defined as "the charging of interest for a loan or forbearance on money in excess of the legal maximum." (8 Miller & Starr, Cal. Real Estate (3d ed. 2001) § 21:1, p. 4, fn. omitted.) In California, the maximum amount that may be charged is set forth in the Constitution. (See Cal. Const., art XV, § 1.) The precise amount is complex and it can vary with economic conditions. (*Ibid.*)

The usury law is subject to many exceptions some of which are set forth in the Constitution (Cal. Const., art XV, § 1), some of which are set forth in various statutes (see, e.g., Civ. Code, §§ 1916.1, 1916.2, 1917.220), and some of which are set forth in the case law. One of the case law exceptions, the joint venture exception, is at issue here. As a leading treatise explains, "Where the relationship between the parties is a bona fide joint venture or partnership, the advance by the partners or joint venturers is an investment and not a loan, and the profit or return earned by the investor is not subject to the statutory maximum limitations of the Usury Law." (8 Miller & Starr, Cal. Real Estate, *supra*, § 21:11, p. 48, fn. omitted.)

There is no precise formula for determining whether a particular transaction is a bona fide joint venture. However, several factors have been identified as relevant when deciding that question. One is whether there is an absolute obligation of repayment. (8 Miller & Starr, Cal. Real Estate, *supra*, § 21:11, pp. 50–51, and cases cited therein.) Another is whether the investor may suffer a risk of loss. (*Id.* at pp. 52–53, and cases cited therein.) Another

factor courts consider is whether the investor has any right to participate in management. (*Id.* at p. 53, and cases cited therein.) The identity of the seller is also a factor. "If the venture between the parties involves the acquisition of property from a third party, the courts tend to conclude that the arrangement between the parties was a risk capital venture and not a loan." (*Id.* at p. 54, and cases cited therein.)

The presence or absence of any one factor is not conclusive when characterizing a transaction. (*Martin v. Ajax Construction Co.* (1954) 124 Cal.App.2d 425, 433 [269 P.2d 132].) Whether a transaction is a joint venture or a loan is a question of fact to be decided by the trier of fact. (8 Miller & Starr, Cal. Real Estate, *supra*, § 21:11, p. 49, and cases cited therein.) Generally, a conclusion reached by the trier of fact will be affirmed on appeal if it is supported by substantial evidence. (See, e.g., *Piedra v. Dugan* (2004) 123 Cal.App.4th 1483, 1489 [21 Cal.Rptr.3d 36].) But where the relevant facts are undisputed, the proper characterization of a transaction presents a question of law that this court reviews de novo on appeal. (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 799 [35 Cal.Rptr.2d 418, 883 P.2d 960].)

Junkin argues the de novo standard should be applied because the facts of this case are undisputed. It is not clear whether that is true; however, we will assume for purposes of this appeal that the facts are undisputed and that de novo review is appropriate.

In this case, Junkin and Bennett both testified that they considered themselves to be *partners* in this venture. We view this as strong evidence that the joint venture existed.

Junkin and Bennett were both on the title to the property and both were jointly obligated on the first loan. Again, we view this as strong evidence that the joint venture existed.

Junkin was absolutely obligated to repay the note that he executed in favor of Bennett. This would tend to undermine the conclusion that a joint venture existed. However, the note was not executed in isolation. It was simply one aspect of a larger transaction under which Junkin and Bennett invested jointly and under which Bennett was not assured that the transaction would be profitable. This factor weighs in favor of characterizing the transaction as a loan, although only slightly.

This leads us to another factor: whether Bennett assumed a risk of the loss of capital. The answer is clearly yes. Bennett was on the title to this property and under his agreement with Junkin he owned 10 percent of the property. If the venture failed, Bennett's investment could be worth nothing. Clearly, Bennett assumed a risk that he might suffer a loss.

There is no evidence that Bennett participated in the management of this venture. Indeed, the evidence showed Junkin was the motivating force behind the purchase. He selected the property, arranged the financing, and even drafted the note that he signed in favor of Bennett. On the other hand, there is no evidence that Bennett was precluded from participating in the management of the venture. Rather, it appears Bennett voluntarily ceded control to his partner. We view this factor as neutral.

Finally, Junkin and Bennett purchased this property from third parties. This tends to support the conclusion that a joint venture existed.

Weighing these factors de novo we agree with the trial court. The joint venture exception to the usury rules applied.

None of the arguments Junkin advances convince us a contrary conclusion is appropriate.

Junkin argues that under cases such as *Martin v. Ajax Construction Co., supra*, 124 Cal.App.2d 425 (*Martin*) and *Whittemore Homes, Inc. v. Fleishman* (1961) 190 Cal.App.2d 554 [12 Cal.Rptr. 235] (*Whittemore*), when there is an unconditional right to receive repayment, the joint venture exception does not apply. While those cases do indicate that the unconditional right to receive repayment is a factor courts may consider when determining whether the joint venture exception applies, it is only one factor. Indeed, the *Martin* case specifically recognizes that the presence or absence of any one factor is not conclusive when characterizing a transaction. (*Martin, supra*, at p. 433.) As we have explained, Bennett's absolute right to repayment on the note did not outweigh the other factors that we have identified. Furthermore, there is an important difference between this case and both *Martin* and *Whittemore*. In neither of those cases did the lender put itself at risk for anything other than the amount loaned. That is not the case here. Bennett cosigned the $1.185 million note from the institutional lender and thus put himself at considerable additional risk. As a risk taker, Bennett could reasonably expect a premium in excess of the amount of money that he loaned. We decline to look at the loan from Bennett to Junkin in isolation and instead will look at the entire transaction between them.

Next, Junkin cites cases such as *People v. Park* (1978) 87 Cal.App.3d 550, 564 [151 Cal.Rptr. 146], for the position that one of the characteristics of a joint venture or partnership is the right of control. He argues that since there is no evidence Bennett controlled this venture, the joint venture exception could not apply. While there is no evidence that Bennett exercised control over this venture, there is also no evidence that Bennett relinquished his authority to control the operation; to the contrary, he could have exercised

some level of control had he chosen to do so. Given that Junkin and Bennett both testified that they considered themselves to be partners, Bennett's failure to exercise control is not determinative.

Next, Junkin argues the fact that Bennett did not provide any money for the joint venture *after* the initial purchase indicates that this was not a true joint venture. This argument overlooks the absence of any evidence in the record suggesting Bennett was *obligated* by the terms of his agreement with Junkin to provide additional money after the initial purchase. Junkin and Bennett were free to structure their joint venture (or partnership as they both described it) on whatever terms they deemed appropriate. That agreement was not somehow invalidated simply because Bennett was not required by the terms of his agreement to advance additional funds after the initial purchase.

■ Finally, Junkin notes that generally, a partner who seeks to obtain money from another partner must bring an equitable suit for dissolution and an accounting. (See *Hosking v. Spartan Properties, Inc.* (1969) 275 Cal.App.2d 152, 156 [79 Cal.Rptr. 893]; *Barlin v. Barlin* (1956) 145 Cal.App.2d 390, 393 [302 P.2d 457].) He contends that since Bennett chose to nonjudicially foreclose his deed of trust, he should be estopped from arguing the joint venture exception applied. We find nothing in the record that indicates Junkin raised this issue in the court below. It is forfeited for purposes of appeal. (*Sommer v. Gabor* (1995) 40 Cal.App.4th 1455, 1468 [48 Cal.Rptr.2d 235].) It is also unpersuasive. As a general rule a party will not be permitted to take inconsistent positions in separate legal actions. (*Tuchscher Development Enterprises, Inc. v. San Diego Unified Port Dist.* (2003) 106 Cal.App.4th 1219, 1245 [132 Cal.Rptr.2d 57].) The doctrine is intended to protect a litigant from playing " ' " ' " 'fast and loose with the courts.' " ' " ' " (*Ibid.*) Nevertheless, because the doctrine is equitable in nature it is invoked by a court at its discretion. (*Ibid.*) We find nothing here that suggests Bennett is playing fast and loose with the courts. Indeed, the opposite is true. The record indicates Junkin is a highly experienced real estate investor who saw an opportunity to make money on a well-located piece of land. Now that the deal has soured, he seeks to use the courts to evade the consequences of the transaction that he himself structured. We decline to apply the equitable doctrine of estoppel here.

■ We conclude the trial court correctly ruled that the joint venture exception to the usury rules applied. Since the transaction was not usurious, it follows that Golden West properly conducted the foreclosure sale.[1]

---

[1] Having reached this conclusion, we need not decide whether, as Golden West has argued, the transaction was not usurious.

## III. *DISPOSITION*

The judgment is affirmed.

Simons, J., and Bruiniers, J., concurred.